UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:07CR0578 DJS (AGF) |
| COURTNEY COSTELLO, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Courtney Costello.  Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).  Defendant filed a motion to suppress statements.  (Doc. No. 14).  An evidentiary hearing was held on November 16, 2007, with further testimony heard on November 21, 2007.  The government was represented by Assistant United States Attorney Thomas J. Mehan.  Defendant was present and represented by his attorney, Stephen R. Welby.[1]  At the hearings, the government presented the testimony of Officers Joseph Stuckey, Joseph Mader, and Roger Patterson, who have been employed with the St. Louis Metropolitan Police Department (SLMPD) for approximately six years, seven years, and fifteen years, respectively.  The witnesses were cross-examined extensively by defense counsel.  Trial is scheduled for January 7, 2008.

---

[1]  Counsel has since withdrawn due to a conflict that arose after the hearings, and the Federal Public Defender was appointed to represent Defendant.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On the night of September 19, 2007, Officer Mader and his partner, Officer Stuckey, were on patrol, driving a marked police vehicle.  At approximately 11:00 p.m., they received a call for assistance related to shots that had been fired on an undercover police unit in the area of Fairgrounds Park, in the City of St. Louis.  The shots had been fired by unknown suspects driving an SUV.  Officers Mader and Stuckey responded to the call and began to canvass the area.  While driving in the area, the officers spotted a Chrysler vehicle driving eastbound on Natural Bridge.  Because the officers knew that Chrysler vehicles are frequently stolen, they ran a computer check on the vehicle, consistent with their common practice with regard to Chrysler vehicles.  They were able to access the computer system on the laptop in their police vehicle, and learned that the Chrysler was wanted for leaving the scene of an accident.

Based on the computer information, the officers decided to stop the Chrysler. They activated their overhead lights, and the driver of the Chrysler turned right, and then turned into an alley and continued driving.  Although the car looked like it was slowing, it did not stop.  The officers then turned on their siren, at which time the Chrysler drove off at a high rate of speed.  At the cross-street, there was a downward dip in the street, and as the Chrysler passed this point, the driver lost control of the car.  The Chrysler swerved

from side to side and then hit a fence-post on the right-hand side of the alley and came to a stop.

After the Chrysler came to a stop, the officers stopped their vehicle approximately ten feet away. The area was fairly well-lit by street lights and the officers' spot light and headlights, and the officers were able to see the driver, who was the only occupant of the car, later identified as Defendant Courtney Costello. Defendant got out of the car, stopped and turned, at which time the officers saw that Defendant had two handguns, one in each hand. Defendant began to raise his arms, and the officers, fearing that Defendant was going to fire at them, accelerated their police vehicle and struck him. Defendant flew up in the air, landed on the ground, and dropped the two pistols, which slid across the alley. Defendant then got up and ran off, jumping a fence and crossing the street in the area near 4115 Lexington. Officer Mader pursued Defendant on foot. Officer Stuckey remained behind and attempted to locate the handguns, and was able at that time to find one of the handguns. Officer Stuckey then returned to the patrol car and began to circle the area, but the officers were unable to find Defendant.

Through their investigation, the police identified the owner of the Chrysler, Mr. Priester. He advised the police that he had given Defendant Costello permission to drive his Chrysler, and that shortly after the incident, Defendant had contacted him and told him that he (Priester) needed to report the car as having been stolen in a car-jacking. Priester refused and told Defendant to report the matter himself.

The officers continued in their efforts to locate Defendant, and thereafter learned

of a residence in Northwoods at which they believed Defendant might be found.  The officers contacted officers from the Northwoods police department, and on September 27, at around 9:30 p.m., approximately 10-15 officers from the Northwoods police department and SLMPD went to the Northwoods address.  They assembled that large a number of officers based on concerns that Defendant might be violent, in light of his criminal history and his actions on the night in question.  Officer Mader and another officer went to the door and spoke to a female occupant.  They told her they were looking for Defendant, and she said he was not there.  They asked to speak to the owner of the residence, and she got her mother.  The mother, Karen Fletcher, gave the police consent to search the residence for Defendant and apparently signed a written consent form.

Officer Mader and another officer searched the basement area, which Officer Mader understood was where Defendant's girlfriend's room was located.  He found Defendant hiding in the basement laundry room.  Defendant was taken into custody and advised that he was being detained for further investigation.  He was then transported to the Northwoods police station, where he was arrested and booked as a fugitive.  After processing by the Northwoods police, Defendant was transported to the SLMPD Bureau of Patrol Support.  Officer Mader advised Defendant that he was under arrest on charges from the City of St. Louis related to the events of September 19th, and he advised Defendant of the charges.

At the Bureau of Patrol Support, Officers Mader and Patterson took Defendant to the booking room, which is a large area.  Officers Mader and Patterson were the only

officers present and Defendant's non-writing hand would have been cuffed to the table. Using a card, Officer Mader read Defendant his rights under Miranda.  He stopped after reading each right and asked Defendant if he understood, and Defendant acknowledged that he understood each right.  At the time Defendant was advised of his rights, he did not appear to be under the influence of drugs or alcohol, and his answers were responsive. No promises or threats were made to induce Defendant to waive his rights.  Defendant thereafter made a verbal statement regarding the events of September 19, 2007.  Officer Mader did not inquire about the source of the firearms at that time.

The interview took place at approximately 11:00 or 11:30 p.m., and lasted approximately twenty to thirty minutes.  The officers did not make any promises or threats to induce Defendant's statement.  Defendant did ask, at some point, what would happen to him, and Officer Mader advised him that he would apply for warrants.  He further advised Defendant that he did not have any specific plans to attempt to have the matter prosecuted on a federal level, but that if the federal law enforcement wanted to pick up the case, they could do so.  Officer Mader's statement was truthful, as he had no plans to pursue federal prosecution.  The officers did not promise Defendant that if he cooperated they would not refer the matter to federal officers, nor did they make any other promises to Defendant.  Defendant did not ask to speak to an attorney.

When the interview was concluded, the officers asked Defendant if he wanted to reduce his statement to writing, and Defendant declined.  Defendant said that he had talked to an attorney some days prior to that evening, and the attorney had said never to

put anything in writing. The context in which Defendant had spoken to the attorney was not further clarified, and the Court does not know whether it was in the context of the other charges which were then pending against Defendant, pertaining to an unrelated incident. After Defendant declined to put his statement in writing, he was placed in custody.

Officer Mader worked through the night, until approximately 6:00 or 7:00 a.m. the next morning, at which time he went home to go to sleep. The warrant office did not open until 8:00 a.m. At approximately 4:00 p.m. on September 28th, when he returned to work, Officer Mader applied for warrants related to Defendant, which were thereafter issued at approximately 5:00 p.m.

At approximately 5:30 p.m., Officer Mader interviewed Defendant a second time, to try to determine the source of the firearms. The interview took place on the second floor of the Justice Center. Although there were many other people around, no one else participated in the interview. Defendant appeared to recognize him from the previous night. Officer Mader again read Defendant his <u>Miranda</u> rights, and Defendant acknowledged that he understood his rights. Defendant did not appear to be under the influence of drugs or alcohol, and no promises or threats were made to induce his statement. Defendant did not at any time request to terminate the interview, nor did he request an attorney. The interview lasted approximately 10-15 minutes. Defendant made statements regarding the source of the firearms. He advised Officer Mader that he had gotten the firearms from his aunt. He explained that his cousin had previously been shot

twice, and that his cousin had then been killed the day before Defendant's encounter with the police on September 19, 2007. He said that after his cousin was killed, his aunt gave Defendant the firearms and asked him to get rid of them. Officer Mader asked Defendant if he wanted to reduce his statement to writing, and Defendant said no. No further interviews were conducted of Defendant.

## CONCLUSIONS OF LAW

Defendant makes three main arguments in support of his motion to suppress his statements, all in conclusory fashion. First, Defendant asserts that his statements were not voluntary in that he was not brought before a magistrate judge in a timely manner; the interrogation was coercive; Defendant was subjected to duress; and his statements were induced by promises of leniency. Second, Defendant contends that he was not advised of his rights and that the interrogation did not cease after Defendant invoked his right to counsel and to remain silent. Finally, Defendant claims that there was no probable cause for Defendant's arrest. None of Defendant's arguments have merit.

Addressing Defendant's final argument first, the Court finds, based on these facts, that the officers had probable cause to arrest Defendant based on the events of September 19, 2007, for leaving the scene of the accident he had just had and for flourishing firearms at the police. As such, any argument that Defendant's statements are the fruit of an unlawful arrest should be rejected.

The Court further finds that Defendant knowingly and voluntarily waived his rights and that his statements on September 27 and 28 were voluntarily made. A

defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Dickerson, 530 U.S. at 444 (citing Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).

Prior to making his first statement, Defendant, who was then a 25-year old adult, was orally advised of his Miranda rights and he acknowledged that he understood those

rights.  At the time he was advised of his rights, he did not appear to be under the influence of any drugs or alcohol or impaired in any other manner.  Defendant had had some prior experience with law enforcement, as evidenced by the fact that the grand jury indictment charges Defendant with receiving firearms on September 19, 2007 while he was under indictment for other state charges.  At the time of the interview, Defendant was seated in a large room, with only two officers present, and no promises or threats were made to induce Defendant's waiver or his oral statement.  Although Defendant was truthfully advised, in response to his question, that there was a possibility that federal law enforcement officers could elect to prosecute the case federally, no promises were made to Defendant in this regard.  Defendant's statement was made shortly after his arrest, and the interview lasted only approximately 20 - 30 minutes.

Defendant's statement the following day was made after Defendant was again advised of his rights under <u>Miranda</u>.  Although Defendant was still in custody at the time, there were no threats or promises made to induce either his waiver or his statement.  He was interviewed by only a single officer, during the daytime, and the interview lasted only 10 - 15 minutes.  Thus, the Court finds no basis for Defendant's assertions that his statements were the result of any promises, duress, or coercion.

Defendant further asserts that his statements should be suppressed because he "was not presented before a magistrate 'as soon as Practicable,' and said statement was obtained prior to presentation before a magistrate." [Doc. No. 14, p.1].  Because Defendant's motion is essentially a form motion, without explanation or citation to

authority, it is not entirely clear what Defendant is asserting as the basis for his motion.

To the extent Defendant is asserting a violation of his Fourth Amendment rights, there is

no evidence in this record to suggest that Defendant was not afforded a probable cause

hearing within the 48-hour period found to be presumptively constitutional in <u>County of

Riverside v. McLaughlin</u>, 500 U.S. 44, 56 (1991) (holding "judicial determinations of

probable cause within 48 hours of arrest will, as a general matter, comply with the

promptness of <u>Gerstein</u>"[2]).  A delay of less than 48 hours raises constitutional concerns

only if the defendant meets the burden of establishing that the delay was improper and

unreasonable, such as where the delay was solely for the purpose of "'gathering

additional evidence to justify the arrest, . . . motivated by ill will against the arrested

individual, or [represented] delay for delay's sake.'"  <u>United States v. Davis</u>, 174 F.3d

941, 947 (8th Cir. 1999) (quoting <u>Riverside</u>, 500 U.S. at 56).  Defendant, however, has

made no such showing here.  <u>See</u> <u>United States v. Rivera</u>, 370 F.3d 730, 734 (8th Cir.

2004) (finding overnight detention reasonable following late-evening arrest and where

"detention was not a charade conducted for the sole purpose of investigating

[defendant's] other crimes"); <u>United States v. Sholola</u>, 124 F.3d 803, 819-21 (7th Cir.

1997) (no detention for improper purpose where investigators had probable cause to

arrest defendant).  Further, even assuming that suppression is an appropriate remedy for a

---

[2] <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975).

Gerstein/Riverside violation,[3] the Court does not find that there was any unreasonable or unnecessary delay. Moreover, Defendant has not shown how his statements were the result of any such violation. See United States v. Forde, 30 F.3d 127 (Table), 1994 WL 390143, at *3 (1st Cir. 1994) (suppression not appropriate where no showing that evidence was the product of any unlawful detention).

To the extent that Defendant is asserting that the delay should be considered in connection with the overall determination of voluntariness, under the Fifth Amendment, the Court notes that delay, alone, generally is not sufficient to support suppression of a confession.[4] See United States v. Hornbeck, 118 F.3d 615, 618-19 (8th Cir. 1997) (holding 40-hour delay did not warrant suppression of statement where the defendant was arrested in evening, was advised of rights and statement was otherwise voluntarily made); accord United States v. Rosario-Diaz, 202 F.3d 54, 70 (1st Cir. 2000) (holding 28-hour delay did not warrant suppression where there was no evidence of coercion by law

---

[3] See Davis, 174 F.3d at 946 n.8 (recognizing the question of whether suppression is the appropriate remedy as undecided).

[4] The Court notes that the six-hour provision of 18 U.S.C. § 3501(c) has no application. The docket sheet reflects that Defendant was first indicted federally on October 3, 2007, and was not taken into federal custody until October 24, 2007. The Supreme Court has recognized that, absent a showing of a collusive agreement between state and federal officers to deprive a suspect of his procedural rights – a showing Defendant has not made here – delay within the meaning of § 3501 is measured from the time the suspect is arrested on federal charges, and does not include periods when the suspect is in state custody. See United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994) ("As long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered."); United States v. Chevre, 146 F.3d 622, 624 (8th Cir. 1998).

enforcement and where defendant did not specify how the delay rendered his confession involuntary); United States v. Van Metre, 150 F.3d 339, 348 (4th Cir. 1998) (holding 55-hour delay did not warrant suppression where no coercive police conduct occurred). Here, Defendant has not asserted how any such delay affected the voluntariness of his statements, and the Court finds no support in the record for any assertion that the delay here negatively impacted the voluntariness of Defendant's confessions. Based on the totality of the circumstances, including the time that passed between his arrest and each of his verbal statements, the Court finds Defendant knowingly and voluntarily waived his rights and that both of his verbal statements were voluntarily made. See United States v. Castro-Higuero, 473 F.3d 880, 886-87 (8th Cir. 2007) (finding Miranda waiver and post-arrest statement made at a detention center, at 3:15 a.m., approximately one hour after arrest, to be valid and voluntary where substance of Miranda rights was communicated to defendant through Spanish interpreter, agent was unarmed and in street clothes, and defendant was not restrained); Hornbeck, 118 F.3d at 618-19.

The Court also rejects Defendant's contention that his statements were elicited in violation of either his right to remain silent or his right to counsel. From a factual standpoint, Defendant did not, during either of the interviews, ever request that the questioning cease or express any desire to refuse to respond to further questioning. Defendant's statement, at the conclusion of the first interview, that an attorney had previously advised him never to put anything in writing, does not constitute an assertion of Defendant's rights under either the Fifth or Sixth Amendment.

If a defendant invokes the right to remain silent during questioning, the police must cease all questioning. Michigan v. Mosley, 423 U.S. 96, 103-04 (1975); Miranda, 384 U.S. 473-74; Simmons v. Bowersox, 235 F.3d 1124, 1131 (8th Cir. 2001). Once a defendant has waived his Miranda rights, however, the invocation of the right to remain silent must be clear; if it is ambiguous or equivocal, further questioning is permitted. See Simmons, 235 F.3d at 1131; United States v. Al-Muqsit, 191 F.3d 928, 936 (8th Cir. 1999), vacated in part on other grounds, United States v. Logan, 210 F.3d 820 (2000). The test for whether the defendant has unambiguously invoked his rights is an objective one, based on the defendant's statements as a whole. Simmons, 235 F.3d at 1131. Likewise, the Miranda right to counsel attaches only when a suspect makes a clear and unequivocal request for counsel. Davis v. United States, 512 U.S. 452, 458-59 (1994) . A defendant must make the type of clear and unequivocal request that would alert a reasonable officer to the fact that defendant is requesting an attorney. Id.

Neither Defendant's statement that an attorney had previously advised him not to put anything in writing, nor his refusal to put his oral statement into writing based on some prior advise of counsel, constitutes an unambiguous invocation of his right to remain silent. See Connecticut v. Barrett, 479 U.S. 523, 529 (1987) (request to see attorney before making written statement did not preclude oral questioning by police absent an additional invocation of right to remain silent); Fare v. Michael C., 442 U.S. 707, 727 (1979) (defendant's statement that he "could not, or would not, answer the question" not considered an assertion of the right to remain silent); United States v.

Jacobs, 97 F.3d 275, 280 (8th Cir. 1996) (request for attorney prior to taking a polygraph exam did not preclude further questioning by police).  Nor can Defendant's statement reasonably be viewed as invoking the right to counsel.  See Davis, 512 U.S. at 462 (holding that suspect's remark to agents, "Maybe I should talk to a lawyer," did not constitute a request for counsel); Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (holding that defendant's question, "Could I call my lawyer?" was ambiguous and did not constitute a clear invocation of the right to counsel).  Indeed, with respect to Defendant's first statement, the issue is not even presented, as Defendant completed his first statement before the comment about the attorney's advice was even made.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. No. 14] be **Denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 12th day of December, 2007.